UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                      Bankruptcy No. 05-31171
                                                            Chapter 7
Allen M. Kraft and Chondra L. Kraft,

                          Debtors.
_____/

Farmers Crop Insurance Alliance, Inc.,

                          Plaintiff,

              v.                                            Adversary No. 07-7030

Allen M. Kraft and Chondra L. Kraft,

                          Defendants.
_____/


**MEMORANDUM AND ORDER**

By Complaint filed October 8, 2007, Plaintiff Farmers Crop Insurance Alliance, Inc. commenced the above-captioned adversary proceeding seeking a determination that it overpaid Debtors/Defendants Allen M. Kraft and Chondra L. Kraft on an indemnity claim. Plaintiff argues that the $498,778.00 indemnity overpayment is nondischargeable under section 523(a)(2)(A) of the United States Bankruptcy Code because Debtors knowingly and intentionally obtained the payment by false pretenses, false representation, and actual fraud. Plaintiff further argues that 20% of the $41,302.00 premium amount, interest on the indemnity and premium debts, and costs Plaintiff incurred to collect the debts are also nondischargeable. In the alternative, Plaintiff argues that all of these amounts are postpetition debts. Answering, Debtors/Defendants deny the allegations.

The matter was tried on December 9 and 10, 2008.

## I. FACTUAL BACKGROUND

In 2002, Debtor/Defendant Allen Kraft (hereafter, "Kraft")[1] had a partnership with Harold Tweeten to grow irrigated onions. In 2003, Kraft and Tweeten partnered to grow potatoes on the same land. After they had begun planting the potato crop, Kraft and Tweeten realized the operation would be larger than anticipated, and they brought Wesley Doepke into the venture.

A.    Agent Don Streifel

Agent Don Streifel was Kraft's insurance agent from 1993 to 2000. Kraft used another insurance agent in 2001 and 2002 because of a lender's requirement, but he went back to Agent Streifel in 2003, the crop year at issue in this case. In 2003, Don Streifel was an agent of North Central Crop Insurance, Inc., a predecessor of Plaintiff. Agent Streifel operated as Painted Woods Insurance out of Washburn, and his wife, Loretta, was his secretary and bookkeeper.

Kraft lived in Washburn in 2003, and Agent Streifel's home was a couple miles south of Washburn. Washburn is a small community, and, in addition to seeing each other for insurance purposes, Kraft testified he also saw Agent Streifel a couple times per month during the 10 years Kraft lived in Washburn. Kraft testified he would discuss farming with Agent Streifel over coffee. Kraft testified that Agent Streifel was well aware of his relationship with Tweeten and Doepke. Although he did not specifically recall telling Agent Streifel about the partnership, he testified he was sure he did. Kraft further testified that Tweeten visited Agent Streifel's office with him. Agent Streifel acknowledged that Tweeten visited his office with Kraft, but denied

---

[1] The Krafts were married at all times relevant to this proceeding but have since divorced. Although Chondra L. Kraft is obligated on the debt at issue, she was not actively involved with the farming operation and relied on Allen Kraft to handle crop insurance.

2

knowing that Kraft and Tweeten were partners.  Agent Streifel testified that although he saw Kraft and Tweeten around town, they never talked about growing potatoes together.

On February 7, 2003, Kraft met with Agent Streifel to complete his 2003 crop insurance application.  Agent Streifel testified that this meeting was the first time Kraft mentioned his intention to grow potatoes in 2003.  The insurance application states that the only other person with an interest in the potato crop was Chondra Kraft.

Agent Streifel testified that the insurance policy for the 2003 potato crop was submitted in Kraft's name because Kraft was the person renting the land, and an application is submitted in the name of whomever rents the land.  The policy insures the crop, he said, but you have to be equally sure you have the land right because insurance goes with the land.  Agent Streifel further testified that in the case of 40-50% of policies, farmers share effort, time and equipment, and who obtains the insurance depends on who has the interest in the land.  Agent Streifel testified that the Farm Service Agency (FSA) is the lead agency and if the land is rented in Kraft's name, the reported acreage on the insurance has to match in order to get coverage.  In the case of a crop loss, an insurance adjustor goes first to FSA to see whose name the land is in. Agent Streifel was asked at trial whether his understanding was that where an operation had partners, the application should be submitted in the name of whomever rented the land, to which he responded, "Sounds right."  He then contradicted this testimony by stating that he would have written separate applications if he had known Tweeten and Kraft were partners.

Kraft testified that his understanding of insurance was that the ground was insured depending on who held the contractual rental agreement.  Throughout his years of experience with insurance and FSA, that was how it had worked.  Prior to 2003, all his crop insurance had

3

been taken out in the name of the renter, and Kraft believed Agent Streifel told him, maybe even every year, that that was how it had to be handled.

Tweeten also testified that only Kraft applied for insurance on the 2003 potatoes because the potatoes were being grown on Kraft's land. It was Kraft's field, and he and Kraft had a gentlemen's agreement on the side. Tweeten testified that he and Kraft thought they were handling the insurance correctly.

Kraft was farming in Burleigh County, and Agent Streifel "kind of knew" that Kraft had been farming that particular land for two years. Burleigh County was a county for which the Federal Crop Insurance Corporation had not published actuarial documents for potatoes. Because the federal government requires published actuarial documents for insurance coverage of any given crop in any given county, the federal regulations did not allow potato coverage in Burleigh County in 2003 without express permission from the federal government in the form of a written agreement.

Kraft did not have any potato production history in 2003. If a producer does not have a production history, he can still get an approved yield called a transitional yield (T-yield) which is determined by the regional office of the Risk Management Agency (RMA), an agency of the United States Department of Agriculture (USDA). The regional office sometimes uses a reference county in determining a T-yield. Agent Streifel told Kraft that McLean County's T-yield was 250 and that Burleigh County usually has a worse T-yield. Agent Streifel testified he and  Kraft discussed Kraft partnering with another producer with an established yield or actual production history (APH) so that Kraft could get a better yield. This would result in a better insurance payment if the crop were a loss. Kraft testified that Agent Streifel told him to find a

4

producer with a three-year potato growing history to partner with so that he could use that producer's yield.

B.      S&H Potato Productions, Inc.

S&H Potato Productions, Inc. hired Kraft and Kraft's father-in-law to custom combine S&H's potatoes from 1997 to 2003. Kraft testified that he contacted Thomas W. Sanders, one of the two shareholders in S&H, a few days before he filed the application for a written agreement on March 9, 2003.

By all accounts, the conversation between Kraft and Sanders was very brief. Kraft testified that he told Sanders that Agent Streifel told him to partner with a producer that had a potato history, and Kraft talked to Sanders about S&H being involved with Kraft's 2003 potato crop if necessary. According to Kraft, although Sanders did not want to be involved in any of the work, he was willing to be an investor. Kraft said he and Sanders still needed to work out the terms of the partnership, if it became necessary, because he and Sanders did not talk about any specifics.

Sanders testified that to the best of his recollection, partnering with Kraft did not come up in the conversation, but he conceded that he did not recall the details of the conversation. He further testified that S&H would not have partnered with Kraft because S&H had previously had a bad partnership with another producer, and S&H already had its hands full. Kraft conceded that it was "very possible" that Sanders never understood there to be an agreement to partner between Kraft and S&H. In fact, Kraft testified that even he did not believe that there was really a partnership between S&H and him. Kraft was certain, however, that he expressed an interest in partnering, but that it is possible Sanders did not get that impression.

5

In any event, Sanders faxed Kraft S&H's APH information.  Sanders testified he gave Kraft the information for reference because Kraft asked specific questions about crop insurance including expected yields.  Sanders testified he did not know that Kraft planned to submit S&H's information for a written agreement, and he only learned it was submitted when he was deposed in relation to this litigation.  Kraft, on the other hand, testified that he asked Sanders if he could use S&H's data to get insurance coverage, and Sanders gave him permission and sent him the information he needed.  Tweeten testified that Kraft told him he had talked to Sanders, and that Sanders said he would be willing to partner with them if necessary.  Agent Streifel also testified that Kraft came back to his office with S&H's APH data and told Agent Streifel that he could partner with S&H if necessary.

C.     Written Agreement Application

Agent Streifel filled out a written agreement application that Kraft signed on March 9, 2003.[2]  Kraft testified that none of the writing on the application was his except for his signature. Agent Streifel testified that his wife filled out the application through question 14, but that he filled out the rest.  He testified that the information in the application all came from Kraft, and that he, Agent Streifel, did not make any assumptions.

The application states, "Producer is requesting potato coverage for Burleigh County.  This is land he has rented in the past.  He will share crop with S&H Potato Productions, Inc. of Jamestown.  The APH data is enclosed for similar land in McLean County . . . producer feels it

---

[2] It is clear by the face of the application and the testimony at trial that it was signed on March , 2003, not May 9, 2003, as stipulated by the parties.

is imperative he get potato insurance."[3]  When asked why he did not write that Kraft would

partner with S&H only if he needed to, Agent Streifel responded Kraft expected he would have

to partner with S&H to get a decent T-yield.

The application asks, "NAME OF OTHER PERSON(S) SHARING IN CROP" under

which is written, "None."  Kraft testified that he knew at the time that Tweeten would be sharing

in the crop, but Agent Streifel wanted to handle it that way.  Agent Streifel, on the other hand,

testified that Kraft told him to write, "None."  When Agent Streifel was asked why he wrote

"None" despite the described partnership with S&H, he said it was an error, and that S&H should

have been listed as having at least a 1% share.

The application also states that the land had been operated 10 years by the present

operator.  When asked about this, Kraft testified that he had rented the land for three years, and

that he would not have said that he operated it for 10 years.  Kraft testified that Agent Streifel

knew he had not farmed that land for 10 years because Agent Streifel had been his agent for

many years and kept a history of Kraft's operation, including the two years Kraft used another

agent.  Further, Agent Streifel testified he knew Kraft had only been farming the land for two

years, and he conceded he made a mistake when he wrote that Kraft had operated the land for 10

years.

Agent Streifel submitted the application with S&H's APH form attached to North Central

Crop Insurance.  Julie Powell, an underwriter for North Central Crop Insurance, reviewed it and

mailed it to RMA.

_____

[3] The parties stipulated to this language, but the Court notes that the stipulated language
is substantively correct, but not exact.  The stipulated language changed punctuation,
capitalization and abbreviation.

On April 3, 2003, RMA granted Kraft's request for a written agreement.  When RMA issued the written agreement, Agent Streifel called Kraft and asked him to come to the office to go over it.  Agent Streifel explained to Kraft that RMA had offered him a T-yield lower than S&H's approved yield, but that if Kraft was willing to accept it, he would not need to partner with S&H.  It appeared as though the lower T-yield of 306 in the written agreement came from the county average from Emmons County because S&H's approved yield was 336.  Agent Streifel testified that they were surprised at the T-yield offered so he called Plaintiff's underwriter, Powell, to make sure he understood correctly that Kraft did not have to partner with S&H.  Powell confirmed that he was correct.  Agent Streifel testified that, based on the conversation he had with Powell, he advised Kraft that he did not need to partner with S&H.

On April 12, 2003, Allen Kraft accepted the terms of the written agreement that RMA offered.   Kraft paid a premium of $41,302.00 he policy was issued.

D.    The Insurance Policy

Kraft's 2003 Multiple Peril Crop Insurance Common Crop Insurance Policy (MPCI) provides the basic insurance provisions and limits coverage of other parties' shares and states:

> Insurance will attach only to the share of the person completing the application and will not extend to any other person having a share in the crop unless the application clearly states that: (1) The insurance is requested for an entity such as a partnership or a joint venture; or (2) You as landlord will insure your tenant's share, or you as tenant will insure your landlord's share.  In this event, you must provide evidence of the other party's approval (lease, power of attorney, etc.).  Such evidence will be retained by us.  You also must clearly set forth the percentage shares of each person on the acreage report.

The MPCI states that an applicant's "share" in an insured crop is his "percentage of interest in the insured crop as an owner, operator, or tenant at the time insurance attaches."  Further, if the

insurer determines a payable loss occurred, the indemnity is calculated by multiplying the total indemnity for the crop by the percentage of the insured's share in the crop.

Plaintiff introduced several insurance handbooks, totaling nearly 900 pages, into evidence. All of these manuals related to Kraft's 2003 insurance and included: 2003 Crop Insurance Handbook, 2001 Written Agreement Handbook, Loss Adjustment Manual Standards Handbook, and Northern Potato Loss Adjustment Standards Handbook.

Roxann Brixen, a multi-peril manager for Plaintiff's administrator, Great American Insurance Company, testified, however, that none of these handbooks are disseminated to insureds. Further, Brixen acknowledged that it is important for insurance agents to be knowledgeable about the information in these handbooks because insureds rely on their agents.

Brixen testified that Plaintiff's underwriter, Powell, was wrong when she told Agent Streifel that Kraft did not have to partner with S&H under the written agreement. Brixen said that Powell should have advised Agent Streifel that the written agreement was issued with the expectation that Kraft would partner with S&H because that was what Kraft's application stated. Brixen further testified that Agent Streifel also erred when he told Kraft he did not need to partner with S&H.

Powell testified by deposition that to properly use S&H's data in 2003, Kraft would have had to supply three years of production history from S&H, and Kraft would have needed at least a 1% interest in S&H's crop the immediately preceding year, 2002. Brixen testified that based on the written agreement handbook, Powell appeared to be incorrect about Kraft needing to partner with S&H in the past although Brixen was not sure. Powell also testified that in applying for a written agreement in Burleigh County, a producer needs three years of production history

9

in Burleigh County, but Brixen testified that was also incorrect because the handbook says that the history from a neighboring county may be used. Brixen testified that when the written agreement was issued to Kraft, proper advice would have been that Kraft needed to partner with someone with experience.

Brixen further testified that if things had been done correctly, Kraft, Tweeten and Doepke all would have been listed on one application. The overall premium price would have been the same except that there is a $30 fee by crop by county so there would have been a total difference of $60.

Kathleen Gilbertson is a senior risk management specialist with RMA. RMA establishes the policy and procedures for crop insurance. RMA has a standard reinsurance agreement whereby the government subsidizes the premium for policy holders, and insurance companies are paid to sell crop insurance. RMA oversees the insurance companies and makes sure they follow the rules. She testified that insurance companies rely on the certification statement on applications because when an applicant submits a form with a certification, the insurance company does not have to verify that what the document says is true. Gilbertson testified that if an applicant says on his written agreement application that he is partnering with another producer, RMA relies on that because otherwise the APH would not be used and RMA would not offer insurance.

Gilbertson testified that in order to get a written agreement in 2003, an applicant had to supply three years of production history of his own or another person's if the other person agreed and the other person would be sharing in the future crop. Agent Streifel testified that he did not

know a three-year production history was necessary at the time Kraft applied for the written agreement.

Gilbertson testified that insureds do not generally read the handbooks, and, indeed, Kraft testified that he had never seen a crop insurance handbook.

E.     2003 Potato Crop

As already discussed, Doepke became involved with Kraft and Tweeten's potato venture after planting had begun.  More specifically, Kraft testified that Doepke did not become involved until after he had submitted the insurance and written agreement applications.  Doepke testified that he talked to Kraft about insurance when he became involved in the venture because of the importance of insurance.  Doepke testified that he asked Kraft whether they were covered, and Kraft assured him they were.  Doepke further testified that he took for granted that the insurance did not require any change by virtue of his becoming involved because the land was in Kraft's name and the insurance was in Kraft's name.  He testified that Kraft told him that because the insurance was in Kraft's name, Agent Streifel said to leave the insurance in Kraft's name.

On June 26, 2003, Kraft signed an acreage report.  A column titled, "% INT OTHER SHARING" is blank.  On July 9, 2003, Kraft signed an acreage report that says he has a 1.00 share in the potato crop.  Kraft testified that he went to the FSA office to sign the acreage report and that he assumed the potato crop also had to be insured in his name because the land contract was in his name.  FSA required him to take the land contract with him to FSA.  Kraft signed a production worksheet after inspections of the potato crop on October 6, 2003, and November 11, 2003.  This form also indicates he has a 1.00 interest or share.

The 2003 potato crop was a total loss, and Kraft gave Plaintiff notice of a potential crop loss under the policy.  Plaintiff paid Kraft an indemnity of $498,778.00 on November 21, 2003.

11

Kraft deposited the indemnity payment. Kraft testified that the insurance check was issued payable to the bank, his wife, and him. He stated that his share went to the operating loan, and the bank released the rest of the money to Tweeten and Doepke without dispute.

F.    2004 Crop Year

To get coverage for the next crop year, insureds have to report their production from the previous year. On February 27, 2004, Kraft signed a production certification stating that he had a 100% interest in the 2003 potatoes.

Agent Streifel also handled the crop insurance for Kraft, Tweeten and Doepke in Sioux County as well as Burleigh County in 2004. Agent Streifel testified that he filed a written agreement application for Kraft as the 100% owner of a crop on a certain piece of land in Sioux County, and he also filed a written agreement application for Tweeten as the 100% owner of a crop on the same land because neither Kraft nor Tweeten had secured the lease at that point in time and they did not know who would be on the lease agreement. If Tweeten's application had been denied, then they would have tried to get a renewal on Kraft's. If Tweeten was the renter, then they would apply in Tweeten's name – it depended on whose name was on the lease at FSA. Agent Streifel further testified that he prepared a written agreement application for Doepke as the 100% owner of a crop on land in Burleigh County, and he also prepared a written agreement application for Kraft as the 100% owner of the crops on the same land. Agent Streifel explained that he prepared it that way because Kraft and Doepke did not know whose name would be on the lease, and Kraft's application was a backup plan because it is easier to get a renewal.

RMA denied Kraft's written agreement application for potatoes for the 2004 crop year because Kraft did not provide an APH form with three consecutive years of actual records for

12

potatoes. Kraft appealed the denial, and the USDA National Appeals Division (NAD), an administrative adjudicatory tribunal, conducted an adjudicatory hearing. The hearing officer found that RMA approved the 2003 written agreement based on the shared APH yield data of S&H. Agent Streifel testified that he first became aware of the partnership among Kraft, Tweeten and Doepke at the appeal hearing.

Based on the information that came to light during the 2004 application process, Plaintiff voided Kraft's 2003 policy and notified Kraft of the amount claimed to be owed.

G.    Subsequent Events

Defendants filed a voluntary petition for bankruptcy relief under Chapter 12 of the Bankruptcy Code on June 7, 2005.

On February 6, 2006, Kraft and several other farmers served a state court complaint on Plaintiff and Agent Streifel relating to their written agreement applications for potatoes for 2004. To the best of the Court's knowledge, this matter is still pending.

Kraft was convicted of conversion of mortgaged property in 2006.

## II. CONCLUSIONS OF LAW

Section 523(a) of the Bankruptcy Code exempts certain debts from discharge in bankruptcy, including debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A). To establish nondischargeability under section 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that:

(1)    the debtor made a representation;
(2)    at the time the representation was made the debtor knew it was false;

13

(3)    the debtor subjectively intended to deceive the creditor at the time he
       made the representation;
(4)    the creditor justifiably relied on the representation; and
(5)    the creditor was damaged.

Blue Skies, Inc. v. Preece (In re Preece), 367 B.R. 647, 652 (B.A.P. 8th Cir. 2007).  Where an

objecting party fails to establish every element of a section 523(a)(2)(A) action, the indebtedness

at issue is dischargeable.  Simek v. Erdman (In re Erdman), 236 B.R. 904, 910 (Bankr. D.N.D.

1999). Exceptions to discharge are narrowly construed against a creditor and liberally in favor

of the debtor to effectuate fresh start policy of the Bankruptcy Code. Merchants Nat'l Bank of

Winona v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).

There are two representations at issue in this case: Kraft's representation on the insurance

and written agreement applications and acreage reports that he was the sole owner of the 2003

potato crop, and Kraft's representation on the written agreement application that he would partner

with S&H in the 2003 potato crop.

A.    Ownership Interest

The parties agree that Kraft represented on the insurance and written agreement

applications that no one else had an interest in the 2003 potato crop other than his wife.  In fact,

Tweeten and Doepke had one-third interests in the venture.  Doepke, however, only became

involved after the representations at issue were made.  Specifically, Kraft signed the insurance

application on February 7, 2003, and the written agreement application on March 9, 2003.

Doepke did not join the potato growing venture until after Kraft had completed the insurance and

written agreement applications and after Kraft and Tweeten had begun planting the potatoes. The

only false representation at the time of the applications, therefore, was the failure to list Tweeten

14

as an interest holder.  Kraft did, however, fail to list both Tweeten and Doepke on the acreage
reports which were completed well after Doepke became involved.

      1.      Knowledge of the Falsity

In assessing a debtor's knowledge of the falsity of a representation, the court must
consider the knowledge and experience of the debtor.  Legendary Loan Link, LLP v. Glatt (In
re Glatt), 315 B.R. 511, 520 (Bankr. D.N.D. 2004) (citing The Merchants Nat'l Bank of Winona
v. Moen, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).  A false representation made under
circumstances where a debtor should have known of the falsity is one made with reckless
disregard for the truth and satisfies the knowledge requirement.  Id.

Plaintiff argues that Kraft was a seasoned purchaser of crop insurance who had been
buying insurance on various crops for more than a decade.  Plaintiff further argues that Kraft's
testimony showed that he is familiar with the crop insurance program, suggesting that the Court
must conclude that his knowledge of the program would include something as material and
fundamental as how to accurately report his share in the 2003 potato crop.

Defendants argue that the representation that they were 100% owners was done at the
instruction and advice of Agent Streifel who knew that Tweeten was involved.  Although the
Court suspects that Agent Streifel knew more about the partnership between Kraft and Tweeten
than he let on at trial, the Court cannot conclude, based on the evidence, that Agent Streifel was
fully aware of the partnership.

Next, Defendants argue that Kraft believed that the insurance application had to be in the
name of the person whose name was on the lease.  Although this explanation may justify why
Kraft completed the insurance application, the written agreement application, and acreage reports

15

as he did, it does not change the fact that he was aware of the falsity of the information.  It does, however, directly bear on the following element, intent to deceive.

        2.      Intent to Deceive

Because direct proof of intent is nearly impossible to obtain, a creditor may present evidence of the surrounding circumstances from which intent may be inferred.  Universal Bank, N.A. v. Grause (In re Grause), 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000).

Plaintiff argues that Kraft is not credible because his testimony in this matter has been inconsistent, and he was recently convicted of conversion of mortgaged property.  Considering all the evidence and circumstances, the Court is not persuaded.

First, Kraft had no reason to deceive Plaintiff.  Plaintiff did not introduce any evidence to show that the misrepresentations as to ownership advantaged Kraft in any way.  When Kraft received the indemnity, it was not a windfall.  His share of it went to pay the operating loan, and he gave the rest to Tweeten and Doepke.  Kraft, Tweeten and Doepke saved a mere $60.00 on a  $41,302.00 premium by handling the insurance as they did, and the Court finds it reasonable to conclude that the paucity of this savings is a circumstance that supports that Kraft did not intend to deceive Plaintiff.

Next, Kraft testified credibly that it was his understanding that the insurance application had to be in his name because he was the person who held the land lease. Kraft testified that he believed that the ground was insured depending on who held the contractual rental agreement. Throughout his years of experience with insurance and FSA, that was how it had worked.  Prior to 2003, all his crop insurance had been taken out in the name of the renter, and Kraft believed Agent Streifel told him, maybe even every year, that that was how it had to be handled.  This

16

misconception about who needs to obtain insurance was also held by Tweeten and Doepke. Tweeten testified that only Kraft applied for insurance on the 2003 potatoes because the potatoes were being grown on Kraft's land.  It was Kraft's field, and Tweeten testified that both he and Kraft thought they were handling the insurance properly.  Doepke had the same impression. Doepke testified that he took for granted that the insurance did not require any change by virtue of his becoming involved because the land was in Kraft's name and the insurance was in Kraft's name.  He testified that Kraft told him that because the insurance was in Kraft's name, Agent Streifel said to leave the insurance in Kraft's name.

Agent Streifel's testimony was not entirely clear, and he seemed to have some confusion – or, at the very least, inconsistent testimony – about the issue of who needs to take out insurance. Agent Streifel testified that the insurance policy for the 2003 potato crop was submitted in Kraft's name because Kraft was the person renting the land, and an application is submitted in the name of whomever rents the land.  The policy insures the crop, he said, but you have to be equally sure you have the land right because insurance goes with the land.  Agent Streifel further testified that in the case of 40-50% of policies, farmers share effort, time and equipment, and who obtains the insurance depends on who has the interest in the land.  Agent Streifel testified that the Farm Service Agency (FSA) is the lead agency and if the land is rented in Kraft's name, the reported acreage on the insurance has to match in order to get coverage.  In the case of a crop loss, an insurance adjustor goes first to FSA to see whose name the land is in. Agent Streifel was asked at trial whether his understanding was that where an operation had partners, the application should be submitted in the name of whomever rented the land, to which he responded, "Sounds right."  He then contradicted this testimony by stating that he would have written separate

17

applications if he had known Tweeten and Kraft were partners. Brixen testified, however, that if things had been handled correctly, Kraft, Tweeten and Doepke all would have been listed on one application.  Even with the benefit of hindsight, Agent Streifel was mistaken.  Moreover, even if Agent Streifel did not know that Tweeten was sharing in the potato crop with Kraft at the time of the application, which is questionable, it is reasonable to conclude that Kraft believed Agent Streifel knew of Tweeten's involvement and advised him accordingly.

Next, Agent Streifel similarly mishandled the crop insurance for Kraft, Tweeten and Doepke in 2004 which supports the conclusion that Kraft relied on Agent Streifel to his detriment in 2003.  Agent Streifel testified that he filed a written agreement application for Kraft as the 100% owner of a crop on a certain piece of land in Sioux County in 2004, and he also filed a written agreement application for Tweeten as the 100% owner of a crop on the same land because neither Kraft nor Tweeten had secured the lease at that point in time and they did not know who would be on the lease agreement.  If Tweeten's application had been denied, then they would have tried to get a renewal on Kraft's.  If Tweeten was the renter, then they would apply in Tweeten's name – it depended on whose name was on the lease at FSA.  Agent Streifel further testified that he prepared a written agreement application for Doepke as the 100% owner of a crop on land in Burleigh County in 2004, and he also prepared a written agreement application for Kraft as the 100% owner of the crops on the same land.  Agent Streifel again explained that he prepared it that way because Kraft and Doepke did not know whose name would be on the lease, and Kraft's application was a backup plan because it is easier to get a renewal.

The policies and procedures for the issuance of crop insurance coverage and written agreements are voluminous.  It is simply not reasonable to expect Kraft to have had more

18

knowledge about it than Plaintiff's own agent, and Agent Streifel was, at best, confusing and inconsistent and, at worst, wrong in advising Kraft.

For these reasons, the Court is not convinced that Kraft intended to deceive Plaintiff at the time he made the representations that he was not sharing the crop with anyone else. Rather, Kraft believed, albeit incorrectly, that he was properly insuring the potato crop. Kraft may have let Agent Streifel's adamance about the necessity of the person renting the land matching the person insuring the crop to mislead him into believing that the insurance needed to be in his name alone, but the Court does not find this to be indicative of an intent to deceive. Although Plaintiff argues that Kraft cannot claim reliance on Agent Streifel's statements, the Court disagrees. Whether Kraft reasonably relied on Plaintiff's agent is not the issue; whether Kraft intended to deceive Plaintiff is, and Kraft's misunderstanding of the insurance requirements as a consequence of several circumstances, including his own lack of sophistication as to the complexities of insurance and Agent Streifel's misinformation and/or poor communication skills, prompted Kraft to make the misrepresentations, not an intent to deceive.

Because Plaintiff failed to establish Kraft's intent to deceive, its claim based on the misrepresentations as to ownership fails, and the Court need not reach the remaining elements under section 523(a)(2)(A).

B.      Partnering with S&H

There is no dispute that Kraft represented on the written agreement application that he would be partnering with S&H in the 2003 potato crop.

19

1.      Knowledge of the Falsity

Plaintiff argues that Kraft knew that there was never an agreement to partner with S&H and that he gave inconsistent testimony about whether he had a partnership with S&H.

Kraft conceded that  he did not believe that there was really a partnership between S&H and him based on the phone conversation he had with Sanders.  Rather, his testimony was that he believed – and told Tweeten and Agent Streifel – that S&H would partner with him if necessary.  Unfortunately, the written agreement application, as completed by Agent Streifel, does not say that he would partner with S&H if necessary.  It says, "He will share crop with S&H[.]" Notwithstanding, Kraft expected to have to partner with S&H, and he believed he would work out an arrangement with S&H if necessary.  The Court is not convinced that the preponderance of the evidence supports the conclusion that Kraft knew that the unqualified representation that he would partner with S&H was false at the time.

Plaintiff's failure to carry its burden of proof as to this element is a sufficient basis to conclude that Plaintiff's claim under section 523(a)(2)(A) fails.  The Court will nonetheless address the issue of whether Kraft intended to deceive Plaintiff because that analysis provides additional support for the conclusions regarding Kraft's lack of knowledge of the falsity of the representation.

2.      Intent to Deceive

Plaintiff argues that the chronology of this case shows that Kraft intended to defraud Plaintiff from the time Kraft contacted Sanders for purposes of obtaining S&H's APH history.  Plaintiff further argues that Kraft knew he needed a three-year APH history to apply for a written agreement because he approached Sanders about using his APH form.

20

Although Kraft knew at the time he signed the written agreement application that a partnership with S&H was not formalized, the Court deems credible his testimony that he believed he could partner with S&H if the written agreement required him to do so.  Sanders testified that partnering with Kraft did not come up in the conversation, but Sanders conceded that he did not recall the details of the conversation.  The fact that Sanders faxed Kraft the necessary APH information bolsters Kraft's claim that he asked Sanders if he could use S&H's data and that Sanders gave him permission.  It is reasonable to conclude that Kraft did exactly what had been suggested by Agent Streifel – he located a potential partner to share in the growing of potatoes so that he could use their APH, with the ownership percentages and other details to be determined later.  Because Agent Streifel, through the advice of Plaintiff's underwriter, incorrectly told Kraft that he did not need to partner with S&H, it became unnecessary for Kraft to pursue the partnership further.   Lastly, both Tweeten and Agent Streifel testified that Kraft told them he could partner with S&H if necessary.  Kraft's reiteration to each of them demonstrates that his testimony at trial was consistent with the statements he made to each of them five years earlier.

For these reasons, the Court is not persuaded that Plaintiff has shown by a preponderance of the evidence that Kraft intended to deceive Plaintiff by representing that he would be partnering with S&H.  Rather, the evidence supports that Kraft believed he could partner with S&H if necessary, and that the partnership was rendered moot by the written agreement and Plaintiff's agent's and underwriter's advice.  Plaintiff's claim under section 523(a)(2)(A) based on Kraft's representation that he would partner with S&H therefore fails, and the Court need not reach the remaining issues under section 523(a)(2)(A).

Based on the foregoing, Plaintiff failed to prove its claims under section 523(a)(2)(A) by a preponderance of the evidence.  The debt at issue, a $498,778.00 indemnity overpayment, is not a postpetition debt and is dischargeable.  The Court has considered Plaintiff's other requests and deems them to be without merit.  The Court has also considered Defendants' request to be awarded their costs and attorney fees and denies the same.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this March 17, 2009.

**WILLIAM A. HILL, JUDGE**
**U.S. BANKRUPTCY COURT**